UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
JERMAINE LEWIS,

                        Plaintiff,              1:08-CV-614

            v.

EDDIE MOLLETTE; MICHAEL GAVIN;
FELICIA KELLER; JOHN BAHRET; NATE
LASSIC; and JOHN and JANE DOE 1-10.

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                         OF COUNSEL:

LEVENTHAL & KLEIN, LLP               BRETT H. KLEIN, ESQ.
45 Main Street, Suite 230
Brooklyn, New York 11201


NEW YORK STATE ATTORNEY GENERAL      CHRISTINA L. ROBERTS-RYBA, ESQ.
– ALBANY OFFICE
Attorneys for Defendants Mollette,
Gavin, Bahret, and Lassic
The Capitol
Albany, New York 12224


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

        Plaintiff Jermaine Lewis ("plaintiff" or "Lewis") brought suit against Eddie Mollette

("Mollette"), Michael Gavin ("Gavin"), John Bahret ("Bahret"), and Nate Lassic ("Lassic")

(collectively "defendants") alleging a deprivation of his First, Fourth, Fifth, Eighth, and

Fourteenth Amendment rights; excessive force; failure to intervene; and supervisory liability

all pursuant to 42 U.S.C. § 1983.  The complaint also alleged claims against Felicia Keller ("Keller") however she has not been served and thus has not appeared in this action.[1]

Defendants[2] moved for summary judgment to dismiss the complaint pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.  Plaintiff opposed.  Oral argument was heard in Utica, New York on November 22, 2010.

## II. <u>BACKGROUND</u>

The following facts are undisputed unless otherwise noted.  In 2005 Lewis, then 15 years old, was an inmate at the Highland ("Highland") Office of Child and Family Services ("OCFS").  Plaintiff was incarcerated at Highland in 2004 after an arrest for robbery.  Prior to his incarceration at Highland, Lewis spent time at similar detention facilities on charges of robbery, assault, and violation of release terms.  At the time of the incident, plaintiff resided in a Mental Health Unit at Highland where Mollette, Gavin, Keller, Bahret, and Lassic were employed.[3]

On the morning of July 21, 2005, Lewis was in his room at Highland when his unit was called to line up before being transported to school.  Residents were permitted to go to

---

[1] According to the docket and summons returned unexecuted, Keller is no longer employed at the facility and has moved out of New York State.

[2] Since Keller has not appeared, the current motion is made by defendants Mollette, Gavin, Bahret, and Lassic.

[3] At the time of the incident, the defendants held the following positions: defendant Mollette was a Youth Division Aide ("YDA") for 17 years and was responsible for supervising the division residents, maintaining safety and security within the residence, and encouraging residents to follow their programs; defendant Bahret was a Senior Youth Division Counselor and was responsible for acting as unit administrator for the Mental Health Unit and managing the unit; defendant Gavin was a YDA working in unit 29H of Highland which is located adjacent to the Mental Health Unit; defendant Keller was a YDA; and defendant Lassic was a YDA and was responsible for coordinating movement of the residents between facilities and assisting in restraint procedures when necessary.

their lockers to get materials they needed for school.  The residents then got into a line and Mollette locked the doors to the residents' rooms.  After Lewis lined up and the doors were locked, he realized he had his grandmother's address on a small piece of paper in his pocket.  He requested that Mollette unlock the door to his room so he could put the address inside before going to school.  Mollette refused to unlock the door and told plaintiff to slide the piece of paper under his door.  Lewis refused and expressed concern that the paper could get lost if someone went into his room and accidently stepped on it.  Mollette then told plaintiff he could put the address in his locker.  Lewis refused because he was afraid the address might get stolen since the lockers were not locked and not a safe place to store items.  He also refused to keep the address in his pocket because residents were subject to random searches and he was afraid that if a search was conducted, he would be forced to throw the address out.[4]

Lewis began to express dissatisfaction with his options.  He alleges that Mollette said "fuck it" and gave him an ultimatum – either put the address somewhere or Mollette would leave him at the unit and he would be considered "AWOL."  See Roberts-Ryba Affirm., Ex. A, Dkt. No. 33-3, 41:3-7 ("Lewis Dep.").  Lewis claims that he chose to put the address in his locker, commented "this is bullshit," and as he walked back from his locker he was tackled by Mollette.  Id. at 43:2-3, 43:21 - 44:14, 46:25 - 47:24, 48:14 - 49:16.  He testified that at this time the other residents were beginning to depart the unit.  Id. at  43:4-12.

Defendants dispute this and claim that after Lewis was given the ultimatum, he went into a rage and began to yell and curse.  Mollette Dec., Dkt. No. 35-1, ¶ 6.  Mollette

---

[4] The parties dispute whether Lewis would have been forced to throw the piece of paper out had it been found.  Lewis' pockets were searched on a prior occasion but he did not have anything in his pockets at that time.

claims that plaintiff started to throw himself violently into the lockers and threatened to assault other residents when he got to school.  Id.  He alleges that he tried to calm Lewis but he was hysterical and refused to listen.  Id.

It is undisputed that thereafter, Mollette approached Lewis and initiated a two man Physical Restraint Technique ("PRT") on him.[5]  Mollette took the primary position and attempted to restrain Lewis' arms while pulling him down to the floor.  Keller took the secondary position and attempted to restrain Lewis' legs but was unable to do so because he was kicking and resisting the restraint.  Bahret arrived on the scene and replaced Keller in the secondary position.  He attempted to restrain Lewis' legs but had difficulty as Lewis continued to resist the PRT.  Plaintiff claims that Mollette and Bahret had him under control at this point.

When Mollette initiated the PRT the other residents were "standing next to the front door, the exit, where you leave out the unit."  Lewis Dep. at 44:15-25.  Lewis testified that Keller was standing next to the line of residents and was in direct view of himself and Mollette.  Id. at 45:5-14.  Plaintiff also indicated that two other residents, Gasper Bishop and "Gzim" or "Gisasky," witnessed the incident.  Id. at 45:15-20, 46:3-8.  It does not appear statements were ever taken from these residents.

At the time of the incident, Gavin was working in a nearby unit and heard a loud noise coming from the Mental Health Unit and ran toward the noise.  Gavin alleges that when he arrived on the scene, he saw Mollette trying to secure the primary position but that he was having difficulty restraining Lewis because he continued to twist and turn in resistance to the

---

[5] The OCFS Crisis Management Physical Restraint ("CMPR") Manual authorizes YDAs to use a PRT in order to prevent a resident from harming him or herself, staff members, or others. See Mollette Dec., Ex. B, Dkt. No. 35-3, 14 ("CMPR Manual").

PRT.  Gavin alleges that he then assisted in the PRT by securing Lewis' left arm and handing it Mollette.  He claims that he was involved in the PRT for less than 30 seconds.  Gavin Dec., Dkt. No. 35-6, ¶ 5-8.

Plaintiff disputes this and alleges that by the time Gavin arrived, Mollette held both of his arms and was not having any problems restraining him.  Lewis maintains that at this point he was laying on the floor, crying, with his arms and legs restrained.  Lewis Dep. at 58:2-6.  He claims that while he was still laying flat on his stomach, Gavin took his left arm from Mollette who already had control of it and pulled it out and twisted it twice toward his back.  Id. at 58:13-16, 59:13-23, 60:7-17, 62:19 - 63:3.  Plaintiff claims that when Gavin did this, he "felt a snap" and "heard it go snap, snap, pop" and then his finger tips went numb. Id. at 58:15-17.  After Mollette heard that plaintiff was in pain, he loosened the restraint. After plaintiff was released from the PRT, staff helped him to his feet.

Lassic arrived on the scene after Lewis' arm was injured and walked with him to the Central Services Unit.  Plaintiff alleges that he told those present, including Lassic, that he could not move his arm.  Lassic does not recall Lewis making any complaints about his arm while walking with him to the Central Services Unit.  Lassic Dec., Dkt. No. 35-8, ¶ 7.

At the medical station, plaintiff complained of pain and swelling in his left arm.  He was given ice and muscle rub was applied to his left shoulder.  He claims that on the day of the incident, he told Dr. Shahbaz Mallick, Highland's psychologist, that Mollette caused his injury by initiating the restraint.[6]

---

[6] Dr. Shahbaz Mallick set up a mediation session attended by both plaintiff and Mollette to resolve their differences.  According to the handwritten notes of Dr. Imtiaz Mallick, Highland's medical director, plaintiff "did allege" – presumably to Dr. Shahbaz Mallick and possibly even to Dr. Imtiaz Mallick – that "staff caused the injury."

Lewis returned to the medical station the following morning, July 22, still complaining of pain in his left arm.  He was taken to a hospital for an x-ray which showed a hairline fracture in his left arm.  He was given a sling for his arm in and Tylenol with Codeine for the pain.[7]

On July 22, the same day, Bahret spoke to plaintiff about the incident and wrote out a report.  Lewis alleges that Bahret wrote out the statement for him but that he did not read it before he signed it.  According to the statement, Lewis stated that he did not feel that any of the officers had intentionally hurt him or tried to abuse him.  Lewis alleges that he never told Bahret that and if he "had read the last two sentences, [he] would not have signed the statement."  Lewis Aff., Dkt. No. 45, ¶ 8.

According to Highland's facility director, Farooq Mallick, all OCFS facilities are required to report abuse allegations to the Institutional Abuse Bureau ("IAB").  The IAB then sends an investigator to the facility to interview parties involved in the incident.  The IAB investigator must then issue a report within 90 days indicating its finding.  See Mallick Aff., Dkt. No. 33-14, ¶ 10.  By letter dated July 29 a Child Abuse Specialist from OCFS notified Farooq Mallick that Lewis was named in a report of suspected child abuse or maltreatment at Highland.  Mollette and Gavin were listed as subjects of the investigation.  The July 29 letter indicated that the report was received by the New York State Central Register of Child Abuse and Maltreatment on July 25 and was transmitted to the OCFS Yonkers Regional Office for commencement of an investigation and evaluation of the report.

---

[7] Plaintiff wore the sling for three or four months and then stopped wearing it and began attending physical therapy to regain strength in his arm.  The physical therapy provided some improvement to plaintiff's ability to use his left arm.  He alleges that he still has pain in his arm and can no longer to lift as much weight or play basketball as a result of the injury.

On July 25, four days after the incident, the IAB started an investigation.  See Roberts-Ryba Affirm., Ex. B, Dkt. No. 33-34 ("Investigation File").  During the investigation, an IAB investigator took statements from those involved, including the plaintiff, Gavin, and Mollette.  Investigation File, 5.  On July 28, one week after the incident, plaintiff told the IAB investigator that Gavin twisted his arm and broke it during the restraint.  Id. at 12.  Other residents who were interviewed indicated that they heard Lewis cursing and yelling and some witnessed the takedown.  Id. at 13-14.  However it appears that residents only witnessed a portion of the events because they were directed to face the wall while the incident was occurring.  Id. at 6.

OCFS completed the investigation on October 19.  OCFS determined the report of abuse to be unsubstantiated against Mollette but substantiated against Gavin.  An October 24 letter to Farooq Mallick from the OCFS Yonkers Regional Office stated that "credible evidence has been found that has led us to conclude that the child named in the report has been abused or maltreated."  Id. at 68.  The letter noted that through interviews and review of the agency's records, OCFS identified the following problem: "On July 21st, 2005 Youth Division Aide Michael Gavin assisted in a three-person restraint and, with force, overextended Jermaine Lewis's arm, causing the child's arm to fracture."  Id.

## III. **DISCUSSION**

Defendants moved for summary judgment dismissing the complaint on the grounds that: 1) plaintiff failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e; 2) plaintiff has not established any violation of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment Rights; 3) plaintiff's claim for supervisory liability lacks merit; 4) plaintiff cannot establish a claim for failure to

intervene; 5) plaintiff's claim for excessive force fails; 6) defendants Bahret and Lassic were not personally involved; and 7) defendants are entitled to qualified immunity.

In response to defendants' motion, plaintiff withdrew all claims against defendants Bahret and Lassic.  He also withdrew all claims under the First, Fourth, and Fifth Amendments and his claim for supervisory liability against the remaining defendants Mollette and Gavin.  Therefore the only disputed issues are whether plaintiff exhausted his administrative remedies under the PLRA; his excessive force and failure to intervene claims against Mollette and Gavin; and whether Mollette and Gavin are entitled to qualified immunity.

### A.  Summary Judgment Standard

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. FED. R. CIV. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).  Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial.  FED. R. CIV. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient

evidence upon which a reasonable fact finder could return a verdict for the non-moving party. Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

### B. Failure to Exhaust Administrative Remedies

Defendants first argue that plaintiff's claims should be dismissed because he failed to exhaust administrative remedies as required by the PLRA before filing this lawsuit.  They argue that plaintiff was given an OCFS Resident Manual during orientation at the facility that provided several channels through which he could make formal and informal grievances and that he did not make any grievance against the defendants.  Plaintiff contends he was never advised of the grievance process and thus he was unaware of any procedure in place at Highland.  He argues that his comments to Dr. Shahbaz Mallick and the IAB investigator were sufficient to advise Highland of his grievance.

At summary judgment, defendants have the burden of proving failure to exhaust as an affirmative defense.  Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999).  The PLRA requires that a prisoner confined in a correctional facility exhaust the available administrative remedies before pursuing a lawsuit.  See 42 U.S.C. § 1997e.  Section 1997e(a) mandates that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  "For litigation within §§ 1997e(a)'s compass, Congress has replaced the 'general rule of non-exhaustion' with the general rule of exhaustion."  Lewis ex rel. Lewis v. Gagne, 281 F.Supp.2d 429, 433 (N.D.N.Y. 2003) (Hurd, J.) (citing Porter v. Nussle, 534 U.S. 516, 525, 122 S. Ct. 983, 986 (2002)).  Yet, "[w]hile Porter requires exhaustion, it does not delineate what constitutes

'exhaustion.'"  Lewis, 281 F.Supp.2d at 433 (citing Hock v. Thipedeau, 245 F.Supp.2d 451,

454 (D. Conn. 2003)).  The exhaustion requirement is "intended to serve the dual purpose of

affording 'prison officials an opportunity to resolve disputes concerning the exercise of their

responsibilities before being haled into courtl[,]' and to improve the quality of inmate suits

filed through the production of a 'useful administrative record.'"  Murray v. Goord,  668

F.Supp.2d 344, 355 (N.D.N.Y. 2009) (Scullin, J.) (citing Jones v. Bock, 549 U.S. 199, 204,

127 S. Ct. 910, 914-15 (2007)).

        Administrative remedies are generally deemed exhausted through the use of formal

grievance procedures.  Giano v. Goord, 380 F.3d 670, 675 (2d Cir. 2004); Lewis, 281

F.Supp.2d at 433.  However, the Second Circuit has recognized that remedies may

sometimes be exhausted through the use of informal channels such as contacting the OCFS

ombudsman with complaints or reporting suspected cases of abuse to the New York State

Child Abuse Hotline.  Lewis, 281 F.Supp.2d at 433-34 (citing Ortiz v. McBride, 323 F.3d 191,

194 (2d Cir. 2003); Marvin v. Goord, 255 F.3d 40, 43 (2d Cir. 2001)).

        In deciding whether a plaintiff's informal efforts suffice, it should be determined

whether the plaintiff made a "reasonable attempt" to exhaust administrative remedies.  See

O'Connor v. Featherston, No. 01 CIV. 3251, 2002 WL 818085, at *2 (S.D.N.Y. Apr. 29, 2002)

(listing plaintiff's "reasonable attempt" to exhaust administrative remedies as one reason

courts have found exhaustion of remedies outside a grievance procedure.); Heath v.

Saddlemire, No. 9:96-CV-1998, 2002 WL 31242204, at *13-14 (N.D.N.Y. Oct. 7, 2002)

(Scullin, J.).  However, inmate plaintiffs need only exhaust "available" remedies.  Abney v.

McGinnis, 380 F.3d 663, 667 (2d Cir. 2004).  Grievance procedures may be deemed

unavailable "where [the] plaintiff is unaware of the grievance procedures or did not

understand [them] or where defendants' behavior prevents plaintiff from seeking administrative remedies." Murrary v. Palmer, No. 9:03-CV-1010, 2010 WL 1235591, at *5 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.).

Defendants submit that before arriving at Highland all residents are instructed on how to file grievances against staff at OCFS facilities. See Mallick Aff., ¶ 4. The instructions are then repeated when residents arrive at Highland and they are given an OCFS Resident Manual that explains the grievance procedure to them. Id. ¶ 5. Residents are instructed on how to fill out grievance forms and where to place the completed forms. Id. ¶ 6. If they choose to file a grievance, residents must do so within 14 days of an incident and grievances must be investigated and a decision rendered within seven days from when the grievance was stamped and logged. Id. The Resident Manual provides additional instructions on how to appeal a decision resulting from the filing of a grievance. See Mallick Aff., Ex. A, Dkt. No. 35-10, 4 ("Resident Manual").

According to the facility director, "[i]f a resident does not wish to use the formal grievance program, he may alternatively contact the OCFS ombudsman and state his complaint." Mallick Aff. ¶ 9; Resident Manual, 6. Additionally, the Resident Manual provides that a resident may tell his assigned counselor or any other employee about his concerns regarding treatment at the facility. See Resident Manual, 6.

Defendants allege Lewis received a copy of the Resident Manual during orientation at Highland however they have not provided any documentation establishing plaintiff's receipt of a Resident Manual. See Resident Manual, i (providing line for youth signature and date). Lewis acknowledged that he received something "similar" to the Resident Manual displayed

to him at his deposition, <u>see</u> Lewis Dep. at 87:12-88:12, but maintains he was unaware of any grievance procedure in place at Highland.  Lewis Aff. ¶ 9.

It is undisputed that Lewis did not file a formal complaint through Highland's grievance program nor did he contact the OCFS ombudsman.  However those avenues are not the exclusive means for a resident to express concerns.  The Resident Manual provides a variety of formal and informal options for residents to express concerns regarding treatment at the facility.  <u>See e.g.</u>, Resident Manual, 3 (pursuant to the formal Resident Grievance Program, residents "<u>may</u> file a grievance about any action or situation that personally affects" them) (emphasis added); <u>id</u>. at 6 (residents can tell staff they would like to call the ombudsman or "<u>may</u> write the ombudsman directly") (emphasis added); <u>id</u>. ("You <u>may</u> tell your concerns to the counselor assigned to your unit or to any other employee.") (emphasis added).

Plaintiff followed one of the options available in the Resident Manual – telling his assigned counselor or "any other employee" about his concerns.  Viewing the facts in the light most favorable to Lewis, he made a complaint through an authorized channel by telling Dr. Shahbaz Mallick, a Highland employee, during his counseling session that Mollette caused his injury by initiating the PRT.  <u>See</u> Investigation File, 7, 15, 58.  Nothing in the Resident Manual presents the grievance program as mandatory or exclusive nor does it list the order in which the options are to be undertaken.

Lewis' age at the time of the incident and his contention that he was never informed of the grievance procedure at Highland also weigh in favor of concluding that grievance processes were "unavailable" to plaintiff.  Plaintiff was 15 years old and residing in a Mental

Health Unit at the time of the incident.[8]  Therefore defendants' motion for summary judgment based on plaintiff's failure to exhaust his administrative remedies will be denied.

### 2. Excessive Force Claim

Defendants argue that their actions were nothing more than the exercise of standard procedure in a good faith effort to restore order and therefore do not constitute excessive force.  Plaintiff denies any violent or threatening behavior and maintains that he was tackled by Mollette without warning.  He contends that Mollette had complete control of him when Gavin arrived and thus Gavin had no need to participant in the PRT.  Lewis also alleges that Gavin deviated from the authorized restraint technique by pulling his arm out and twisting it until it snapped.

The Supreme Court has held that when analyzing an excessive force claim, the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 999 (1992).  It is undisputed that the CMPR Manual authorizes appropriate employees such as Youth Division Aides to use a PRT in order to prevent a resident from harming himself or others and provides specific instruction on how to administer a PRT.  The Manual also states that "[w]hen attempting to calm or move an angry and/or out of control resident, staff shall not place their hands on the resident unless and until it is determined that the use of physical force is necessary."  CMPR Manual, 5.

---

[8] It was also reasonable for plaintiff to believe that the IAB investigation, started several days after the incident occurred, obviated the need to file a formal grievance or take any other steps.  During the IAB investigation, Lewis told the investigator that Gavin broke his arm during the PRT.  See Lewis, 281 F.Supp.2d at 435 ("Noting that an investigation into the incident did ensue, it is reasonable that plaintiffs believed that at least one effort they took accomplished the same result that filing through the formal process would have produced.").

Defendants' motion utterly ignores the material facts in dispute. The parties' motion papers describe two completely different versions of the events that occurred on July 21, 2005. Mollette alleges that when he told Lewis he would not unlock his door, Lewis threw his body or some object into the file cabinet. <u>See</u> Investigation File, 16; <u>see also</u> Mollette Dec., ¶ 6 ("At this point, plaintiff went into a rage. He began yelling, cursing, and throwing himself violently into the lockers and door."). Several residents, including Evan Birmingham, Angel Pino, and Christopher Duncan indicated that they heard plaintiff cursing and yelling before the PRT was initiated. <u>See</u> Investigation Report, 13-14, 53, 54, 55. However none of the witness statements nor declarations by the staff involved indicate that they saw Lewis throw his body or any other object into the lockers, file cabinets, or wall.

Bahret testified that he did not witness the events prior to the PRT because he arrived after the PRT had been initiated. Bahret Dec., Dkt. No. 35-4, ¶ 7-8. Gavin testified that when he arrived, Mollette and Bahret were already using the PRT, thus he did not see any of the events leading up to the use of the restraint. Gavin Dec., ¶ 6-7. Lassic testified that he "arrived on the scene at the end" of the PRT and "did not witness any of the events that transpired between the plaintiff and other officers immediately prior to the restraint." Lassic Dec., ¶ 5, 7. In a statement dated August 5, 2005, during the IAB investigation Keller, who was directly involved in the incident and assisted Mollette in his initial use of the PRT, stated that "Jermaine became out of control - I can't remember why." Investigation File, 56.

Similarly in dispute, plaintiff alleges that when Gavin arrived on the scene, Mollette had full control of him and there was no need for Gavin to assist in the PRT. Gavin contends that Lewis' left arm was free when he arrived and that he was swinging at Mollette, cursing and struggling, and twisting his body the entire time. <u>Id</u>. at 63.

Also disputed are statements from medical providers as to the cause of the fracture.  Registered Nurse and Highland employee Cynthia Jurkowski saw Lewis the morning following the incident and recommended that he be examined by a physician and sent him to the emergency room.  During her interview with the IAB investigator she stated that the injury was not consistent with a staff maneuvering a child's arm behind the back. She noted that when staff manipulate a resident's arm to get the arm behind the back, residents complain of muscle tenderness in the shoulder area.  See id. at 7, 59.  Highland facility physician, Dr. Imtiaz Mallick, told the IAB investigator that the injury was a "crush injury" and there were two possible explanations for how the injury was sustained – either there was an impact against the wall or an impact against the floor.  Id. at 6-7, 60-61.  Dr. Imtiaz Mallick said the injury was not consistent with the allegation that Lewis' arm was manipulated behind his back because if that was the case, his arm would have come out of the socket first.  He concluded that the injury was not caused by staff twisting Lewis' arm.  Id. Physician Assistant Dennis Styles treated Lewis at Orthopedic Associates of Dutchess County.  He told the IAB investigator that it was possible plaintiff's fracture was the result of a staff member twisting his arm behind his back with a fair amount of force.  Id. at 7, 62.  He acknowledged that he did not know the details of how and why the restraint was used, but indicated that it takes a fair amount of force to fracture a teenage boy's humerus.  Id.

In contrast, Dr. Michael Cohen, OCFS Medical Director, stated in an e-mail to an OCFS employee and Child Abuse Specialist that the "statements from the physician [Dr. Imtiaz Mallick] and the orthopedic PA [Dennis Styles] are not useful" because "[t]hey have no specific knowledge of the actual events of the restraint and their statements are almost entirely speculation."  Id. at 40.  He inquired as to whether the fracture was located in the

- 15 -

growth plate or in the calcified bone itself because the location of the fracture would make

difference in his analysis.  He then stated:

> We have had several growth plate fractures of the proximal humerus
> during restraints over the years.  The story is almost always the same: the
> youth's arms were forcefully elevated behind the back during the restraint,
> often after he was already on the ground in the prone position.  A "pop" is
> heard or felt, followed by signifiant [sic] pain.  Often witnesses hear the
> pop.
>
> In my opinion a growth plate fracture that occurs in the manner described
> is always the result of excessive force.  It is not necessary to break the
> arm to achieve control using the standard OCFS restraint technique.

Id.  At his deposition, Dr. Cohen testified that he has seen that type of fracture as a result of

restraints approximately one or two times a year.  See Roberts-Ryba Affirm., Ex. C, Dkt. No.

33-5, 17:13 - 18:16 ("Cohen Dep.").  He testified that plaintiff's injury occurred because his

left arm was "forcefully elevated" behind his back.  Id. at 17:22 - 19:3.  However, he was not

made aware that Highland staff claimed the injury occurred when Lewis threw his body

against a locker.  Id. at 16:18-23.  Dr. Cohen testified that in order to determine whether that

behavior caused Lewis' injury, he would have to learn more details about what part of the

body came in contact with the locker and what sort of force Lewis applied when hitting the

locker.  Id. at 17:7-12.

Considering the facts in the light most favorable to plaintiff as must be done, there

was no reason for Mollette to institute the PRT regardless of whether it was an approved type

of restraint.  According to plaintiff, he was walking back from his locker when, unprovoked

and without reason, he was tackled by Mollette.  Under these facts, Mollette had no reason

and was not authorized to initiate the PRT pursuant to the CMPR Manual.  Thus any force

used by himself and later, Gavin, was excessive.  Furthermore, Mollette had Lewis fully

under control by the time Gavin arrived on the scene and thus Gavin's involvement in the PRT was not the exercise of standard procedure in a good faith effort to restore order – because order was allegedly already restored.  Because there is evidence from which a reasonably jury could find that defendants used excessive force, their motion for summary judgment on this claim will be denied.

### 3.  <u>Failure to Intervene Claim</u>

Defendants contend that plaintiff has not stated a cause of action for failure to intervene because plaintiff only stated conclusory allegations that defendants had an affirmative duty to intervene and that they failed to do so.  Defendants argue that even if plaintiff has stated a claim, he has not provided any facts to show that defendants had a reasonable opportunity to intervene and prevent the harm from occurring.  They also contend that Mollette and Gavin cannot be both responsible for the alleged excessive force and also responsible for failing to intervene at the same time.  Plaintiff rebuts this argument by claiming that even if Mollette did not actively participate in Gavin's excessive use of force, Mollette permitted Gavin to take plaintiff's left arm and thus reasonably could have prevented the harm from occurring.  Similarly, Lewis contends that Gavin failed to intervene when he arrived at the scene and witnessed Mollette's use of excessive force.

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation.  <u>See</u> <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994).  In order to establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual <u>and</u> that the defendant under consideration: "1) possessed actual knowledge of the use by another corrections

officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force." Cicio v. Lamora, No. 9:08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, Mag. J.) (citing Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001); Espada v. Schneider, 522 F.Supp.2d 544, 555 (S.D.N.Y. 2007)), adopted by, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) (Sharpe, J.).

For the reasons discussed above, a reasonable jury could conclude that Mollette and Gavin used excessive force while restraining plaintiff. According to Lewis, Mollette allowed Gavin to restrain his left arm. At the time Gavin twisted and subsequently fractured Lewis' arm, Mollette was standing directly next to Gavin and restraining plaintiff's right arm. Viewing the facts in the light most favorable to Lewis, Mollette witnessed Gavin's excessive force, was standing close enough to be able to intervene, and failed to intervene or stop him from twisting Lewis' left arm. Likewise, assuming plaintiff's version of the events, Mollette already had him fully restrained when Gavin arrived on the scene, and because Mollette was employing excessive force in his unauthorized use of the PRT, a jury could conclude that Gavin had an opportunity to intervene and failed to do so.

Based on these disputed facts, defendants' motion for summary judgment on the failure to intervene claim will be denied.

### 4. **Qualified Immunity**

Defendants argue they are entitled to qualified immunity because it was not objectively reasonable for them to believe that their use of a restraint technique that they had been trained to use would violate any clearly established right. Plaintiff contends that there is

- 18 -

ample evidence for a jury to conclude that Mollette and Gavin acted maliciously and intentionally, and thus their actions were not objectively reasonable.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted).  A government official sued in his individual capacity is entitled to qualified immunity: "(1) if the conduct attributed to him was not prohibited by federal law; (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was 'objective[ly] legal[ly] reasonable[ ] . . . in light of the legal rules that were clearly established at the time it was taken.'" Manganiello v. City of N.Y., 612 F.3d 149, 164 (2d Cir. 2010) (internal quotations and citations omitted).

Based on the material facts in genuine dispute, namely whether plaintiff went into a rage and threw his body against the lockers as defendants contend, or whether as Lewis contends, that he did nothing to provoke Mollette nor demonstrate that he would harm himself or others; it cannot be determined on a summary judgment motion whether defendants' actions were objectively reasonable.  Therefore defendants' motion for summary judgment on the basis of qualified immunity will be denied.

## IV. CONCLUSION

Viewing the facts in the light most favorable to the plaintiff, he put forth a reasonable effort to notify Highland and the IAB investigator of his concerns regarding the incident during which he fractured his arm.  While he did not file a formal grievance with the

facility, one is not required.  Taking as true plaintiff's statements, he utilized informal channels to express his concerns and his actions collectively exhausted his administrative remedies.  Defendants' motion for summary judgment on this basis will be denied.

Due to the disputed material facts, defendants' motion to dismiss the excessive force and failure to intervene claims will be denied.  It is for a jury to determine which version of the incident they find to be more credible.  The motion to dismiss the claims against Mollette and Gavin in their official capacities will also be denied because they are not entitled to qualified immunity on the disputed facts.

All claims against defendants Bahret and Lassic will be dismissed on consent of the parties.  All claims under the First, Fourth, and Fifth Amendments and plaintiff's claim for supervisory liability against Mollette and Gavin will also be dismissed on consent.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment is DENIED;

2.  The complaint against defendants John Bahret and Nate Lassic is DISMISSED on consent of the parties;

3.  The First Cause of Action (Deprivation of Rights) insofar as it alleges a violation of the First, Fourth, and Fifth Amendments is DISMISSED on consent of the parties;

4.  The Fourth Cause of Action (Supervisory Liability) is DISMISSED on consent of the parties;

5.  The First (Deprivation of Rights) insofar as it alleges a violation of the Eighth and Fourteenth Amendments; Second (Excessive Force); and Third (Failure to Intervene) Causes of Action against defendants Eddie Mollette and Michael Gavin remain for trial.

6.  The names of defendants Felicia Keller, John Bahret, Nate Lassic, and John and Jane Doe 1-10 shall be removed from the title of the action.

IT IS SO ORDERED.

_____
United States District Judge

Dated: November 24, 2010
      Utica, New York.